[No. 3071.]

## George Roddy v. The State.

1. Practice—Compulsory Process for Witnesses—Statutory Repeal.—Section 10 of the Bill of Rights guarantees to any one accused of crime compulsory process to procure witnesses in his favor, but this right is regulated by Articles 488 and 489 of the Code of Criminal Procedure. Article 489 of that Code provides as follows: "Where a witness resides out of the county in which the prosecution is pending, the defendant shall be entitled, on application, either in term time or in vacation, to the proper clerk or magistrate, to have an attachment issued to compe

the attendance of such witness. Such application shall be in writing and under oath, shall state the name of the witness and the county of his residence, and that his testimony is material to the defense." It is contended by the State that the effect of the act of April 23, 1883, entitled "An act to provide for the payment of attached witnesses in felony cases," is to so far repeal or modify Article 489 as to commit the matter to the sound discretion of the court when the application is made in term time. *Held,* that the position is untenable; that, tested as it must be by the title, the purpose of the said act of April 23, 1883, was simply to regulate compensation of attached witnesses in felony cases, and it in no way effected the repeal or modification of the Article 489 of the Code of Criminal Procedure.

2. SAME—RULE OF STATUTORY CONSTRUCTION.—It is a constitutional provision that the subject matter of a legislative act shall be expressed in the title. The effect of this provision is to nullify any part of a legislative act not expressed in the title.

3. SAME—PRACTICE.—Applications for attachments for absent witnesses are not subject to judicial discretion, as provided with regard to applications for continuance. The materiality and probable truth of the testimony expected to be secured from the witnesses named in the application for attachment are not to be determined, on the motion for new trial, in the light of the evidence adduced on the trial. See the opinion *in extenso* on the subject.

APPEAL from the District Court of Bexar. Tried below before the Hon. G. H. Noonan.

The conviction in this case was for the theft of sixty dollars, the property of James Sullivan, in Bexar county, Texas, on the thirteenth day of February, 1883. The punishment awarded was a term of five years in the penitentiary.

James Sullivan was the first witness for the State. He testified that about ten or eleven o'clock on the morning of February 13, 1883, he went into Major Lerick's saloon, on the Alamo plaza, in the city of San Antonio. He met several gentlemen in the saloon, and they took several drinks together. The party took seats in the room west of the bar room. Witness called for drinks for the crowd. Having drank, the party talked together for some time, and the witness called for a second round. When these last drinks were served the bar keeper demanded pay for the drinks served. Defendant told him that he need not be in such a hurry for his pay. The bar keeper repeated his demand, saying that he had to wait on customers, and had no time to fool. Witness thereupon took his purse from his pocket. The bar keeper took the purse from witness's hand, opened it, and

turned it upside down on the table. Two five dollar gold pieces rolled out. One of these the bar keeper replaced in the pocket book, which he handed back to the witness, and the witness replaced it in his pocket. The bar keeper took the other gold piece to the bar, deducted the price of the drinks, and returned to the witness the change in silver, which the witness put in his coat pocket—not the pocket in which he had put his purse. His coat was an ordinary sack coat, with a pocket on each side. When returned to his pocket the purse contained a five dollar gold piece, one ten and nine five dollar greenback bills—in all, sixty dollars. The party remained about the saloon, drinking and talking, until the afternoon. When the party dispersed, the witness walked to the water closet in the back yard of the saloon. Defendant followed, and while the witness was standing in the closet urinating, the defendant came up to his back, ran his hand into witness's pocket and filched the purse and money. Witness turned and told him to let that money alone, that it was his, witness's. Witness owned the money, and defendant took it without his consent. No one was in the back yard at the time but witness and defendant. When he went back into the saloon witness told the parties present that he had been robbed.

Cross-examined, the witness said that he was not the only man in the bar room that day. The defendant and another man were sitting at the table with the witness. Witness saw two soldiers about the bar room, but did not accuse them of the theft, because he knew they did not commit it. The defendant and others were in the saloon when the witness went there. Quite a number of people passed in and out of the bar room while the witness sat there. Witness was drinking, but was not drunk. Witness did not tell the bar keeper who got his money, as he and defendant appeared to be good friends, and witness had no friend present. The witness did not state before justice Adam, on the preliminary examination of the case, that he did not know who got his money. A man who looked very much like the defendant—shaved and dressed like him—sat by the defendant during that trial, and witness was asked which of the two took his money. Witness sat at some distance from the two men, was suffering from cold settled in his eyes, and answered that he could not tell which of the two robbed him at that distance. The counsel for the defendant then (on the examining trial) came near the witness and asked him if the man

who stole the money did not have a mustache about the color of his, the counsel's, mustache. Witness replied that the mustache of the man who stole the money was not so red. Witness was sworn on the examining trial. He could not say whether or not the signature now exhibited was his. He could not write, and he signed documents with a mark. The signature exhibited was with a mark, but witness did not know whether or not he made it. The witness received the nine five dollar bills described on the evening before, for work he had done for the railroad (the Sunset) as a rock mason. Witness could not find Captain Hughes, the detective, that evening, but complained to him next day about being robbed. He could not give Captain Hughes the man's name, for he did not know it. Hughes told him to go to Adam and make complaint. Adam refused to allow the complaint, because witness could not give the defendant's name, but sent an officer with witness to make the arrest if witness identified the man. The bar keeper had refused to give the witness the defendant's name. They found the man—the defendant. Witness pointed him out, and the officer arrested him. Witness was not mistaken. The defendant is the identical man who took the money. While witness and defendant were sitting in the side room, a great many customers passed into the bar room and out, but very few came into the side room. When the witness was paid the nine five dollar bills on the evening before the theft by the railroad officials, he had a twenty dollar gold piece and the ten dollar bill.

Captain T. J. Hughes testified that he was first assistant city marshal, and his special duty was to hunt up stolen property. On the morning of February 14, 1883, J. Sullivan came to his office and reported that he had been robbed the evening before in Major Lerick's saloon. He described the money lost exactly as he described it on this trial, and said that he did not know the name of the man who took it, but would know him if he were to see him. Witness sent officer Abby with Sullivan to Mr. Adam's office to file complaint, and went himself to a barber shop near. While he was being shaved, Abby brought the defendant Roddy to witness and said that he arrested him on Sullivan's identification. Witness told him to take Roddy to his office and wait until he got there. When witness got back to his office Roddy told him that he had no money. Proceeding to search him, witness found on his person four dollars and a half in silver and nine five dollar greenback bills. Witness then sent

Roddy to jail, and Sullivan went to Adam's to make complaint.

Cross-examined, the witness said that the arrest was made on the morning of the day after Sullivan claimed to have been robbed. Witness searched the defendant in the presence of Sullivan and Charles Abby. As soon as witness discovered the nine five dollar bills Sullivan claimed them. When Sullivan first complained to the witness he described the man who robbed him, as well as the money lost. Witness did not find a five dollar gold piece and a ten dollar bill on the defendant. The defendant's general appearance answered well to the description of the man as given by Sullivan. At this point the State rested.

Henry Delespin was the first witness for the defendant. He testified that he knew Sullivan and Roddy, and saw them both at Major Lerick's saloon on the thirteenth day of February, 1883. He had known the defendant for eight or nine years, during which time defendant's reputation for honesty was good. Witness was bar keeper at Lerick's saloon. Sullivan came into that saloon a little before noon on the day in question, and remained there drinking until late in the afternoon. He and others sat together in a back room. Sullivan called for drinks, which witness took to the table and demanded payment. Sullivan put his hand in his pocket, and was so slow that witness became impatient and told him he must go and attend to the customers and had no time to fool with him. He, witness, then took Sullivan's purse, which he had drawn out, and shook two five dollar gold pieces out of it. Witness put one of them back into the purse, took his pay out of the other, and returned Sullivan the change. Witness then went back to his place behind the bar to attend to customers constantly coming in. Later in the evening the defendant came to witness and said: "Henry, I saw that soldier taking that change you gave that old man from his pocket." A while after this the witness saw Sullivan go into the back yard. He came back presently and said that he had been robbed. Witness immediately went and searched the soldier, and found a dollar and a half in silver on him, which he said Sullivan gave him. Sullivan denied it. Witness then searched Sullivan, and found that the pocket book was gone. Sullivan said that the soldier took it. The soldier searched—the other one was drunk and asleep—first said that the defendant gave him a dollar; then two, and then three dollars. Both soldiers were in the yard while Sullivan was out there. No one else was out there. When Major Lerick came witness informed him, and he sent for a po-

lice officer. Policeman Abby soon came, searched the soldiers, and found a dollar or so on one, and arrested one for being asleep and drunk. The other went to his quarters.

Cross-examined, the witness said that the two soldiers were at the saloon drinking when Sullivan came. When witness opened Sullivan's pocket book the defendant and others were sitting with him at the table. Witness saw a roll of greenbacks in the purse, but did not know the size of the bills nor how many there were in the purse. He did not know whether or not the defendant could see the roll of bills. Sullivan was very drunk. Witness searched the soldier immediately upon Sullivan's return from the yard. Roddy helped Sullivan to get out of the door going into the yard, and helped him to get in again. Witness searched but one soldier—the one who was not asleep. Officer Abby searched both, when he came. Witness denied that, soon after the soldiers were searched, he told Abby that he had searched the wrong man; that if he had searched defendant he would have found the money. Sullivan did ask witness defendant's name, which witness did not tell him, but witness thought this occurred on the morning after the theft.

J. D. Roberson was the next witness for the defense. He testified that on the thirteenth day of June, 1883, he was keeping the Favorite Saloon, on Commerce street, in San Antonio. Several days before the arrest of the defendant he was at witness's saloon with a roll of fifty or a hundred dollars in greenbacks, which he wanted to exchange for gold. Witness let him have a twenty dollar gold piece. During the six or seven years the witness had known the defendant, his reputation for honesty was good.

Cross-examined, the witness said that the defendant did not keep money with him. There was a gambling room over witness's saloon, in which, however, the witness had no interest. The witness did not know what business the defendant followed at that time.

S. A. Moody testified, for the defense, that he was not in San Antonio at the time of the alleged theft. A few days before witness left San Antonio, late in January, he met the defendant in Roberson's saloon and gave him eight five dollar bills for two twenty dollar gold pieces. Defendant's reputation for honesty, as witness had known it for eight or nine years, was good.

Henry Ansell testified that he was the book keeper at the Vaudeville theatre and bar. The defendant was employed at

that bar for about three months, at a salary of sixty-five dollars a month. He left the employ of the Vaudeville some time in January, 1883, when the witness paid him sixty odd dollars. Witness had known the defendant since his first arrival in San Antonio, about a year before the arrest. His reputation for honesty had been good.

Cross-examined, the witness denied that he had ever said to any one that he paid the defendant only two or three dollars when he quit work, and that he did quit work in December, 1882. Witness kept the books. They were not now accessible. They belonged to the estate of Jack Harris, were locked up in the safe, and Billy Sims has the key.

Justice of the peace Anton Adam testified that he held the examining trial in this case. Sullivan, in testifying for the State, first identified the defendant as the man who stole his money, then he said that he thought another man who sat near the defendant was the guilty party. Then he walked up near the parties and said: "My eyes are so sore I can hardly see, but I believe this (pointing to defendant) is the man."

Cross-examined, the witness said that the defense placed next the defendant a man cleanly shaved except the mustache, and dressed like the defendant. Sullivan's eyes, at that time, were very sore, and it was evident that he could see only with great difficulty. Defendant and the man who sat next him favored considerably, except that the defendant's mustache was the lighter. Counsel tried to get Sullivan to say that the mustache of the man who robbed him was dark. Counsel then asked Sullivan to describe the thief, and his description suited the defendant exactly. It also suited the other man, except as to the color of the mustache.

August Krawitz testified that he was guarding the defendant on the examining trial. When Sullivan was first told to identify the man who robbed him, he pointed out the man who sat beside the defendant.

Cross-examined, the witness said that Sullivan's eyes, at that time, were very sore and inflamed, and he, Sullivan, complained that he could see scarcely at all.

Charles Abby testified, for the State, in rebuttal, that he was a policeman. He was called in by Major Lerick to see about a reputed theft of money by two soldiers. Witness searched these soldiers carefully, and found a dollar and thirty-five cents on one of them, and nothing on the other, who was drunk and

asleep. This last one he arrested for being drunk; the other he sent to quarters. Witness searched the premises unsuccessfully for the money. When witness returned from the calaboose, whither he had taken the drunken soldier, to prosecute further search, Henry Delespin, the bar keeper said to him: "You arrested and searched the wrong parties. If you had arrested the man we spoke of arresting the other day as a vagrant, you would have got the right man, and might have found the money." The defendant was the man alluded to as the man whose arrest as a vagrant was discussed a day or two before.

Witness met Sullivan at police headquarters next morning, and was sent with him to Mr. Adam's to file complaint. Adam refused to receive complaint unless Sullivan could name the party; which Sullivan said he could not do, though he said he would know the party on sight. Adam then directed witness to go with Sullivan and arrest the party if identified. They met the defendant at the corner of Main Plaza and Commerce street, and Sullivan whispered to witness: "There is the man now." Witness stepped up to the defendant in a crowd and arrested him. Defendant said: "I know what it is for." Witness then took the defendant to Captain Hughes in a barber shop; thence to Hughes's office, where Hughes afterwards searched him. Sullivan then went to Adam and filed complaint.

Cross-examined, the witness detailed the result of the search of defendant as Captain Hughes did. He had no ill will towards defendant though once, when he, witness, was a hackman, they had some words. He drove the defendant and a fast woman named Alice to the train early one morning. When they went to get out witness discovered that one of them had expectorated over the seats. He asked who did it. Defendant said that he did. Witness told him that he must not spit on the seats. Defendant replied that he would do as he d—d pleased in the hack. Witness replied that "that if it d—d pleased him to spit on the seat, then he would not do as he d—d pleased in that hack." This was the extent of the only disagreement that had ever occurred between witness and defendant.

The motion for new trial was based on the issues discussed in the opinion.

The Reporters have received no brief for appellant.

J. H. Burts, Assistant Attorney General, for the State.

Hurt, Judge. The term of court began on the third day of September, 1883. On the second and seventeenth days of November, 1883, in term time, appellant made application in writing for attachments for several witnesses. These applications were sworn to, and contained all the requisites of Article 489, Code of Criminal Procedure. The learned judge presiding refused the applications, and the attachments were not issued. On the twenty-first day of November the cause was called for trial, and the appellant moved the court to postpone the trial to some future day of the term, in order to procure the attendance of the witnesses for whom attachments had been applied and refused. In his motion to postpone, in lieu of diligence he pleads these applications for attachments and the court's refusal to grant them. This motion to postpone was overruled by the court, and, being tried and convicted, appellant appeals and assigns as error the refusal of the court to grant his applications for attachments, and his motion to postpone the trial.

Two questions are presented: 1. Was the appellant, at the time and under the circumstances, entitled to his attachments? 2. Having been refused these, must the judgment be reversed, or shall this court apply the same rules of law to this matter as are applicable to motions for continuance?

First question: Was appellant entitled to the attachments? By the Bill of Rights, section 10, in all criminal cases the accused "shall have compulsory process for obtaining witnesses in his favor." This right of the accused is controlled and restricted by Articles 488 and 489 of the Code of Criminal Procedure, and these restrictions are reasonable and just. But, though restricted, the right of the accused to compulsory process for his witnesses is very clearly and emphatically stated in Articles 488 and 489. These articles are as follows:

Article 488. "When a witness, who resides in the county of the prosecution, has been duly served with a subpœna to appear and testify in any criminal action or proceeding, and fails to so appear, the State or the defendant shall be entitled to have an attachment issued forthwith for such witness."

Article 489. "Where a witness resides out of the county in which the prosecution is pending, the defendant shall be entitled, on application, either in term time or in vacation, to the proper clerk or magistrate, to have an attachment issued to compel the attendance of such witness. Such application shall be in writing and under oath, shall state the name of the witness

and the county of his residence, and that his testimony is material to the defense."

By the applications, it appears that the absent witnesses "resided out of the county in which the prosecution was pending," and hence they were based upon Article 489. As before stated, these applications were in writing, under oath, and stated the names of the witnesses and the county of their residence, and that their testimony was material to the defense. Having complied with the requisites of Article 489 strictly, evidently the accused, the appellant, was entitled to his attachments, unless this Article has been modified or repealed by subsequent legislation. Has this Article been repealed or so changed as to require something further to be done by the accused than is required by Article 489 to entitle him to his attachments? It is insisted by the State that this Article has been repealed or so modified as that this matter is left in the sound discretion of the trial judge, if the application be made in term time, and that this is the effect of the act of April 23, 1883.

Let us examine this act briefly. What is its subject? It speaks for itself, and in such language as cannot be misunderstood. What says its title, which *must express its subject?* It says that this is "An act to provide for the payment of the expenses of attached witnesses in felony cases."

Was it the object and purpose of the Legislature in this act to repeal or modify the Constitution or existing laws of this State guaranteeing to the accused compulsory process for obtaining witnesses in his favor? Testing the act by its title—and this is the only test, it being absolutely required that the subject be *expressed in the title*—it is evident that there was but one subject in regard to which legislation was proposed, which was to provide for the payment of the expenses of attached witnesses in felony cases. On the other hand, however, if any subject other than " to provide for the payment of the expenses of attached witnesses in felony cases " is embodied in the act, it not being expressed in the title of the act, such foreign matter— matter foreign to the subject *expressed in the title*—is void; that is, the act as to this foreign matter is void.

We are of the opinion that Article 489 of the Code of Criminal Procedure was not intended, nor, in fact, repealed or modified by the act of April 23, 1883; that the only object of this act was, as is expressed very clearly in its title, to provide for the payment of the expenses of attached witnesses in felony cases.

And we are further of the opinion that, if said act contains other matters and treats of other subjects, so far as this may be the case that act is void, because not expressed in its title.

Appellant, therefore, having been deprived of compulsory process for his witnesses, after having complied with the reasonable regulations prescribed in Article 489, was deprived of a legal right—a right of the most vital importance to those accused of crime. Is he, therefore, entitled to a reversal of the judgment, or must the rule contained in Article 560, Code Criminal Procedure, apply? What is the rule in this Article? It is this: "The truth of the first or subsequent application, as well as the merit of the ground set forth therein, and its sufficiency, shall be addressed to the sound discretion of the court called to pass upon the same, and shall not be granted as a matter of right; *provided*, that should an application for a continuance be overruled and the defendant convicted, if it appear upon the trial that the evidence of the witness, or witnesses, named in the application was of a material character, and that the facts set forth in said application were probably true, a new trial should be granted," etc.

Must the rules and principles enumerated above be applied to a case in which the defendant has been denied and refused a plain legal right? Not only so, but denied a right given him by the supreme law of this State—that law over which the Legislature has no control, and beyond the reach of the mighty powers of legislation? We think not. What a fearful doctrine, indeed, to deny and refuse the accused compulsory process for his witnesses—force him to trial—and when, after his conviction, he moves for a new trial, to test the materiality and probable truth of the evidence of his absent witnesses by *the testimony introduced by the State!*

In a case in which the application for continuance has been overruled, if it *appear upon the trial* that the evidence of the witnesses named in the application was material and probably true, a new trial should be granted. If it appear upon the trial from the evidence adduced—all of the evidence, both for the State and the defendant—that the evidence of the witnesses named in the application was material and probably true, a new trial should be granted. Now, in testing the materiality and probable truth of the evidence of the witnesses named in the application, the convicted party has the right to rely and insist upon the whole record—all of the evidence in his favor, as well

as that against him—and, looking to the whole statements of facts, if the evidence of the witnesses named in his application appear to be material and probably true, the law gives him a new trial.

What an alarming doctrine, indeed, that the accused can be denied his process for his witnesses, and, after his conviction, test his right to a new trial by the evidence of the State, or the evidence of the State and the evidence of just so many witnesses as the trial judge may see fit to grant him!

We are of the opinion that the appellant has been denied a legal right—one the benefit of which he used the means to obtain prescribed by the law of the land—a right of the most vital importance to his defense and common justice, and that his conviction has not been by due process of law; for which the judgment must be reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered June 21, 1884.